**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

RAMIZ ZIJAD HODZIC,
  a/k/a Siki Ramiz Hodzic
SEDINA UNKIC HODZIC,
NIHAD ROSIC,
  a/k/a Yahya Abu Ayesha Mudzahid,
MEDIHA MEDY SALKICEVIC, and
  a/k/a Medy Ummuluna,
  a/k/a Bosna Mexico,
ARMIN HARCEVIC,

              Defendants.

Case No. 4:15-CR-00049 CDP- DDN

**DEFENDANTS' JOINT RESPONSE TO GOVERNMENT'S OBJECTION TO MAGISTRATE NOCE'S ORDER AND RECOMMENDATIONS**

DEFENDANTS' JOINT RESPONSE TO GOVERNMENT'S OBJECTIONS

Defendants respond to the Government's objections to Magistrate Judge David Noce's Order and Recommendations (O&R) (Doc. 429).

**I.      Because the Afghan insurgency is different from the Syrian Civil War, *Hamidullin* does not control this Court's decision.**

Contrary to the Government's argument, the Fourth Circuit's decision in *United States v. Hamidullin*, has limited applicability here, because *Hamidullin* involved different factual circumstances. 888 F.3d 62, 65 (4th Cir. 2018). The Syrian Civil War is different in character than the Afghan Taliban insurgency at issue in *Hamidullin*. Because the Syrian conflict is a civil war recognized by the Executive, this Court must not try Defendants for supporting acts of legitimate warfare, because doing so would contradict Supreme Court authority regarding combatant

1

immunity and violate the United States' neutrality.[1]

### A.    *United States v. Hamidullin*

In *Hamidullin*, a former Russian Army officer, Irek Hamidullin, affiliated himself with the Taliban and Haqqani network. *Hamidullin*, 888 F.3d at 65. In 2009, he attacked the Afghan Border Police and a U.S. aircraft and was arrested. *Id.* After Hamidullin came into U.S. custody, the government charged him with violating 18 U.S.C. § 2339A and conspiring and attempting to destroy a U.S. aircraft. *Id.* He asserted the combatant immunity defense at trial, arguing that there was an International Armed Conflict (IAC) between the United States and Afghanistan, so that the United States had to treat him as a prisoner of war under the Third Geneva Convention Relative to the Treatment of Prisoners of War (GPW). *Id.* The district court rejected the defense as a matter of law, holding that Hamidullin had not proffered evidence that the Taliban or the Haqqani network satisfied the four criteria specified in Article 4 of the Geneva Conventions. *Id.*

The Fourth Circuit Court of Appeals affirmed. After holding that the trial court had jurisdiction to determine Hamidullin's status in the first instance, the Fourth Circuit explained that, "by 2009, the conflict in Afghanistan had shifted from an international armed conflict between the United States and the Taliban-run Afghan government to a non-international armed conflict against *unlawful Taliban insurgents*." *Id.* at 69 (emphasis added). The court recognized that this determination was tied up with international recognition. "[B]y the time Hamidullin was captured, the Taliban had been removed from power for eight years and no country recognized the Taliban as the legitimate government of Afghanistan." *Id.* at 70. Accordingly, the conflict between the United States and Afghanistan had ceased. *Id.* All that remained was an insurgency, not an IAC or

---

[1] Defendants have separately objected to Judge Noce's recommendation that the Court not reach this conclusion itself. Doc. 440.

a recognized civil war. *See id.* at 69. Because the conflict was no longer international, the GPW's combatant immunity defense did not apply. *Id.* at 75.

The court also rejected Hamidullin's common-law argument based on the "public authority" doctrine. First, it held that, "[t]ypically, . . . the public authority defense looks to whether the defendant's actions were sanctioned by a U.S. official, as foreign officials do not have authority to authorize violations of U.S. criminal law." *Id.* The Taliban's actions in attacking the Afghan government were not sanctioned by the U.S. government. Second, the court perfunctorily held that the GPW preempted the common law.  "The Third Geneva Convention explicitly defines the category of individuals entitled to POW status, and concomitantly, combatant immunity. . . . As such, the Third Geneva Convention's definition of lawful and unlawful combatants is conclusive." *Id.* at 76. It concluded that, "[b]ecause Hamidullin does not qualify for combatant immunity pursuant to the Third Geneva Convention, he likewise does not qualify for the common law defense of public authority." *Id.*

## B.     A Tale of Two Conflicts

It's important for this Court to read the *Hamidullin* decision in its factual context, because the Taliban insurgency in Afghanistan is different from the Syrian Civil War.

### 1.     The Afghan Taliban Insurgency

The modern history of conflict in Afghanistan arguably began in 1979.[2] In 1979, the Soviet Union sent troops into Afghanistan and installed a new leader, Barbrak Karmal, whom the Soviets perceived as pliable.[3] Nervous about the Soviets' role in Afghanistan, President Ronald Reagan, in

---

[2] KENNETH KATZMAN & CLAYTON THOMAS, CONG. RESEARCH SERV., RL30588, AFGHANISTAN: POST-TALIBAN GOVERNANCE, SECURITY, AND U.S. POLICY 2 (2017).

[3] *Id.*

1985, began supplying weapons to *mujahedin* (Islamic fighters) fighting against the Soviet-backed, Marxist government.[4] On April 14, 1988, the Soviet Union agreed to withdraw from Afghanistan, leaving in place a weak government headed by Najibullah Ahmedzai.[5] Without the backing of the Soviets, Najibullah could not maintain his hold on power.[6] Under an agreement between the various Islamist factions vying for power, Buhannudin Rabbani became president in June 1992 with the understanding that he would leave the presidency in December 1994.[7] Despite this understanding, Rabanni refused to step down when December 1994 arrived—a decision which led to more disagreement and infighting among the *mujahedin* groups.[8]

Frustrated by infighting among the *mujahedin*, a group of, mostly rural, Islamic clerics and students started the Taliban movement from 1993 to 1994.[9] The Taliban combined a harsh interpretation of Islamic law with conservative Pashtun tribal traditions.[10] The Taliban garnered popular support with a promise of unity and took control of Kabul, Afghanistan's capital, on September 27, 1996.[11] The Taliban's reign was cruel. It enforced, through physical penalties, bans

---

[4] *Id.*

[5] *Id.* at 3.

[6] *Id.*

[7] *Id.* at 3-4.

[8] *Id.* at 4.

[9] *Id.*

[10] *Id.*

[11] *Id.*

on television, music, and dancing.[12] "It prohibited women from attending school or working outside the home, except in health care, and it publicly executed some woman for adultery."[13]

Because of these, and other, human rights abuses, President Bill Clinton "withheld recognition of the Taliban as the legitimate government" of Afghanistan, and the "United Nations continued to seat the Rabbani government."[14] The Clinton Administration also condemned the Taliban's sheltering Osama Bin Laden and its refusal to extradite him.[15] Although the U.S. never recognized the Taliban as the legitimate representative of the Afghan people, it declined to intervene.[16] The Northern Alliance, then led by Ahmad Shah Massoud,[17] opposed the Taliban "government" on behalf of the Afghan people, but "Clinton Administration officials asserted that U.S. domestic and international support for U.S. intervention to oust the Taliban militarily at the time was lacking."[18]

---

[12] *Id.*

[13] *Id.*

[14] *Id.* at 5; *see also* Rüdiger Wolfrum & Christiane E. Philipp, *The Status of the Taliban: Their Obligations and Rights under International Law*, 6 MAX PLANCK YEARBOOK OF U.N. L. 559, 577 (2002), https://bit.ly/2sIVYAC ("To sum it up: however successful the *Taliban* were within their reign, the sole legitimate representative of the Islamic State of Afghanistan always was the former government under the leadership of its president Burhanuddin Rabbani. The *Taliban* were never considered to be the sole legitimate government of Afghanistan").

[15] KATZMAN & THOMAS, *supra* note 2, at 5.

[16] *Id.*

[17] Ahmad Shah Massoud was assassinated on September 9, 2001. John F. Burns, *Threats and Responses: Assassination; Afghans, Too, Mark a Day of Disaster: A Hero Was Lost*, N.Y. TIMES (Sept. 9, 2002), https://nyti.ms/2xKZLTK.

[18] *Id.*

That changed on September 11, 2001.  Before September 11, President George W. Bush followed, more or less, the same Afghanistan policy as President Clinton.[19] He dialogued with the Taliban but refused to recognize it. He also refused to support, militarily, the Northern Alliance.[20] After the September 11 attacks, however, President Bush "decided to militarily overthrow the Taliban when it refused a U.S. demand to extradite Bin Laden."[21] Congress gave President Bush authorization to pursue those who harbored individuals who committed the September 11 attacks.[22] And the United States began major combat operations in Afghanistan on October 7, 2001.[23] "The purpose of these operations was to help the Northern Alliance and Pashtun anti-Taliban forces advance by directing U.S. air strikes on Taliban positions."[24] Finally, the "Taliban regime ended completely on December 9, 2001."[25] On May 1, 2003, with the Taliban decimated, the U.S. declared an end to "major combat" operations in Afghanistan.[26]

In the aftermath of toppling the Taliban, the United States helped the Afghan people put in place an interim government headed by Hamid Karzai.[27] Karzai was officially elected president of

---

[19] *Id.* at 6.

[20] KATZMAN & THOMAS, *supra* note 2, at 5-6.

[21] *Id.* at 6.

[22] *Id.* at 6.

[23] *Id.* at 7.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at 7-8.

Afghanistan on October 9, 2004, in Afghanistan's first democratic presidential elections.[28] He remained president of Afghanistan until 2014.[29] Though the Taliban has suffered severe losses, it continues to commit terrorist attacks against the U.S.-supported government of Afghanistan to this day.[30] The Afghan Taliban meets the criteria of a terrorist organization, but "political expedience has obligated keeping the group off the list of" FTOs.[31] By 2009, when Hamidullin was arrested, the Taliban had been out of power for eight years, and the Obama Administration had "narrowed official U.S. goals to preventing [a] terrorism safe haven in Afghanistan."[32]

### 2.     The Syrian Civil War

The Syrian Civil War has followed a different path than the Afghan insurgency. The Syrian conflict began in early 2011. On February 16, at the height of the Arab Spring, a fourteen-year-old student, Naief Abazid, painted on the side of his school: "It's your turn, Doctor Bashar al-Assad."[33] The Syrian government arrested and tortured him along with 22 of his classmates.[34] The boys' torture set off a wave of pro-democracy protests across Syria.[35] The Syrian government responded

---

[28] *Id.* at 8.

[29] *Id.*

[30] *See, e.g.*, Staff, *Taliban Kill Dozens of Police in Western Afghan Province*, REUTERS (May 11, 2018), https://reut.rs/2IajAIF.

[31] Masood Farivar, *Why Isn't Afghan Taliban on US List of Foreign Terror Groups*, VOICE OF AM. (Feb. 20, 2017), https://bit.ly/2kOdaRG.

[32] KATZMAN & THOMAS, *supra* note 2, at 7.

[33] Mark MacKinnon, *The Graffiti Kids Who Parked the Syrian War*, GLOBE & MAIL (Dec. 2, 2016), https://tgam.ca/2FBDWWX.

[34] *Id.*

[35] *Id.*

to these mostly peaceful protests with military force. By March, protesters began calling for the overthrow of Assad's government.[36]

In July 2011, seven officers defected from the Assad military and announced the formation of the Free Syrian Army (FSA).[37] The group called on all members of the Syrian army to defect and join the FSA. On July 12, 2011, then-Secretary of State Hillary Clinton said that Assad had "lost his legitimacy."[38]

By August 2011, Assad had killed more than 2,000 Syrian civilians and had dispatched military troops and tanks to confront protestors.[39] As fighting between the Assad regime and opposition forces intensified, President Obama, on August 18, 2011, called on Bashar al-Assad to resign. "For the sake of the Syrian people," he wrote, "the time has come for President Assad to step aside."[40] The leaders of France, Germany, and Britain followed suit, urging Assad "to face the reality of the complete rejection of his regime by the Syrian people."[41]

---

[36] Madeline Conway, *Timeline: U.S. Approach to the Syrian Civil War*, POLITICO (April 7, 2017), https://politi.co/2H7Ax6a.

[37] Joshua Landis, *Free Syrian Army Founded by Seven Officers to Fight the Syrian Army*, SYRIA COMMENT (July 29, 2011), https://bit.ly/2sRgjof.

[38] Massoud A. Derhally & Nicole Gaouette, *Assad Has 'Lost Legitimacy,' Clinton Says After Attacks*, BLOOMBERG (July 12, 2011), https://bloom.bg/2kQZV2q.

[39] Scott Wilson & Joby Warrick, *Assad Must Go, Obama Says*, WASH. POST (Aug. 18, 2011), https://wapo.st/2y4nDlc.

[40] *Id.*

[41] *Id.*

On July 23, 2012, the Office of Foreign Assets Control (OFAC) granted a United States nonprofit organization, the Syrian Support Group, Inc. (SSG), a license to support the FSA.[42] Specifically, the license authorized the SSG to "export, re-export, sell, or supply to the Free Syria Army financial, communications, logistical, and other services."[43] As noted above, the FSA was formed for the express purpose of fighting against the Assad Government.[44]

By August 2012, the Executive recognized the Syrian conflict as a full-scale civil war. On August 20, 2012, President Obama issued a warning to the Assad regime against using chemical weapons.[45] He stated that any use of chemical weapons by Assad would change the United States' "calculus."[46] If Assad used such weapons, he would cross a "red line" and be "held accountable by the international community."[47] The Executive reiterated that he has "indicated repeatedly that President al-Assad has lost legitimacy, that he needs to step down."[48]

In November 2012, a broad coalition of Syrian opposition groups signed an agreement in Doha, Qatar, creating the National Coalition of Syrian Revolutionary and Opposition Forces (SOC). The SOC was "left open to all hues of the Syrian opposition" and "agreed to bring down

---

[42] Dep't of the Treasury, *Syrian Sanctions Regulations License* ("SSG License), License No. SY-2012-294747-1, https://bit.ly/2JCft4T.

[43] *Id.*

[44] Joshua Landis, *Free Syrian Army Founded by Seven Officers to Fight the Syrian Army*, Syria Comment (July 29, 2011), https://bit.ly/2sRgjof.

[45] James Bell, *Obama Issues Syria a "Red Line" Warning on Chemical Weapons*, Wash. Post (Aug. 20, 2012), https://wapo.st/2sRpAww.

[46] *Id.*

[47] *Id.*

[48] White House Press Release, Remarks by the President to the White House Press Corps (Aug. 20, 2012), https://bit.ly/2Ar62k2.

the regime and all its symbols and mainstays."[49] The group included "the Supreme Military Council representing the Free Syrian Army."[50]

On December 11, 2012, the Executive recognized this broad opposition group as "the legitimate representative of the Syrian people."[51] In an interview with Barbara Walters, President Obama said, "We've made a decision that the Syrian Opposition Coalition is now inclusive enough—is reflective and representative enough of the Syrian population—that we consider them the legitimate representative of the Syrian people, in opposition to the Assad regime, so we will provide them recognition."[52] The Executive further stated that, "obviously, with that recognition, comes responsibilities on the part of that coalition."[53] The Department of State confirmed the next day that this was the United States' policy.[54]

The Executive continued bolstering the SOC and de-legitimizing the Assad regime. On January 29, 2013, announcing additional humanitarian aid for the Syrian people, President Obama said, "For nearly two years, the Assad regime has waged a brutal war against the Syrian people . . . . . The days ahead will continue to be very difficult.  But what's clear is that the regime continues

---

[49] *The Syrian Opposition's Doha Agreement* ("*Doha Agreement*"), ARABSAGA (Nov. 12, 2012, 8:40 AM), https://bit.ly/2Jv733b.

[50] NAT'L COAL. OF SYRIAN REVOLUTION & OPPOSITION FORCES, *Fact Sheet*, https://bit.ly/2Mi5eEy (last visited June 17, 2017).

[51] NPR Staff, *Obama Recognizes Rebels As "Legitimate Representatives" of Syrian People*, NPR (Dec. 11, 2012), https://n.pr/2t1k7Cn.

[52] *President Obama Discusses Syrian Violence, Fiscal Cliff Negotiations in Barbara Walters Interview*, ABC NEWS (Dec. 11, 2012) at 0:49, https://bit.ly/2l7vm8W.

[53] *Id.*

[54] U.S. Dept. of State Press Release, Remarks to the Friends of the Syrian People (Dec. 12, 2012), https://bit.ly/2t2v1bd (archived Apr. 13, 2015).

to weaken and lose control of territory.  The opposition continues to grow stronger."[55]  In June 2013, President Obama publicly "authorized his administration to provide arms to rebels fighting Syrian President Bashar al-Assad."[56]

On August 21, 2013, a year after President Obama warned Assad against using chemical weapons, the Syrian government crossed President Obama's "red line" and used chemical weapons on its own people.[57]  These "outlawed toxins . . . kill[ed] nearly 1,500 civilians, including at least 426 children."[58]

On September 10, President Obama addressed the nation on Syria's use of chemical weapons:

> Over the past two years, what began as a series of peaceful protests against the repressive regime of Bashar al-Assad has turned into a brutal civil war. Over 100,000 people have been killed. Millions have fled the country. In that time, America has worked with allies to provide humanitarian support, to help the moderate opposition, and to shape a political settlement. But I have resisted calls for military action, because we cannot resolve someone else's civil war through force, particularly after a decade of war in Iraq and Afghanistan.
>
> The situation profoundly changed, though, on August 21st, when Assad's government gassed to death over a thousand people, including hundreds of children.[59]

---

[55] White House Press Release, Statement by the President Announcing $155 Million in Additional Humanitarian Assistance for the Syrian People (Jan. 29, 2013), https://bit.ly/2HHhQBR.

[56] Adam Entous & Julian E. Barnes, *U.S. to Arm Syrian Rebels*, WALL ST. J. (June 14, 2013, 5:29 AM), https://on.wsj.com/2JCXICt.

[57] Joby Warrick, *More Than 1,400 Killed in Syrian Chemical Weapon Attack, U.S. Says*, WASH. POST (Aug. 30, 2013), https://wapo.st/2Mm5Uc1.

[58] *Id.*

[59] White House Press Release, Remarks by the President in Address to the Nation on Syria ("Syria Address on Chemical Weapons") (Sept. 10, 2013), https://bit.ly/2pg3nUJ.

At that point, President Obama began seeking authorization from Congress for military action against the Assad regime, in addition to the direct and indirect financial support the United States was already providing to the opposition.[60]

### C.     Different law applies in the Afghan insurgency than applies in the Syrian Civil War.

The situation in Afghanistan in 2009 was the opposite of the situation in Syria during the period of the indictment. The Government's position in this case is tantamount to the Clinton Administration financially supporting the Northern Alliance in a recognized civil war against the Taliban government and authorizing U.S. citizens to support Northern Alliance but also taking the position that anyone fighting against the Taliban government—including as a member of the Northern Alliance—is a murderer.

The Taliban insurgency in 2009 was nothing like the Syrian Civil War during the period of the indictment. Neither the United States nor the United Nations ever recognized the Taliban as the legitimate representative of the Afghan people—not even when the Taliban controlled the country. By 2009, certainly in the view of the *Hamidullin* court, the Taliban was resigned to committing terrorist attacks against the legitimate Afghan government. At that time, the Taliban was not a legitimate representative of the Afghan people in any country's estimation,[61] and there was no civil war recognized by the Executive. As Judge Noce explained, an insurgency and a civil war are different kinds of NIACs. Doc. 429 at 15 ("If the parent State is able to rapidly suppress the insurgents, the event was described as an 'insurgency.' But if the insurgents become a serious

---

[60] *Id.*

[61] Only Pakistan, Saudi Arabia, and the United Arab Emirates ever recognized the Taliban as the sole legitimate government of Afghanistan. Wolfrum & Philipp, *supra* note 14, at 577. By 2009, no country did. *See* KATZMAN & THOMAS, *supra* note 2, at 7.

challenge to the government and achieve formal recognition as 'belligerents,' then the struggle between the two factions becomes the equivalent of war.") (internal citations omitted).

In the Syrian Civil War, the Executive recognized a civil war and also recognized a broad swath of rebels as *the* legitimate representative of the Syrian people. As Judge Noce recognized—and the Government never proffered facts to dispute—President Barack Obama, the Executive, "recognized the Syrian Opposition Council as 'the legitimate representative of the Syrian people.'" Doc. 429 at 4. The United States also financed the rebellion against Assad indirectly and directly. Indirectly, "the United States Office of Foreign Assets Control granted a United States non-profit organization, the Syrian Support Group, Inc., a license to 'export, reexport, sell, or supply to the Free Syrian Army ("FSA") financial, communications, logistical, and other services . . . in order to support the FSA.'" *Id.* And directly, "the Executive Branch of the United States Government ('Executive' or 'President') provided the Free Syrian Army with supplies and assistance in its military operations against the Assad regime."[62] *Id.* As early as July 12, 2011, then-Secretary of State Hillary Clinton said that Assad had "lost his legitimacy."[63] President Obama called on Assad to step down. Doc. 429 at 17.

Judge Noce concluded that "[t]he United States recognized the Syrian opposition and its claim to *de jure* sovereignty as *superior* to that of the Assad regime during the periods relevant to the indictment." Doc. 429 at 17 (emphasis added). Suffice it to say, the United States did not regard any Taliban claim to *de jure* sovereignty in 2009 as superior to President Karzai's. There is a

---

[62] In an argument that would make George Orwell blush, the Government maintains that this robust political and financial support of the rebels does not change their underlying *legal* status as murderers. The individuals who sought (and received) an OFAC license to support the FSA were relying only on the Government's beneficent but mercurial prosecutorial discretion.

[63] Derhally & Gaouette, *supra* note 38.

difference between an insurgent and a belligerent. Doc. 429 at 16. And unlike the Free Syrian Army and the Syrian Opposition Council during the period of the indictment,[64] the Taliban did not have belligerent status in 2009.[65]

Additionally, the United States recognized the Syrian conflict as a civil war, in which its courts have a duty to remain neutral. As Judge Noce observed, in *United States v. Palmer*, Chief Justice John Marshall "noted that courts should look to whether the Executive has recognized the existence of the conflict," and,

> if the government remains neutral, and recognizes the existence of a civil war, its courts cannot consider as criminal those acts of hostility which war authorizes, and which the new government may direct against its enemy. To decide otherwise, would be to determine that the war prosecuted by one of the parties was unlawful, and would be to arrange the nation to which the court belongs against that party. This would transcend the limits prescribed to the judicial department.

*See* Doc. 429 at 12 (quoting 16 U.S. 610, 634 (1818)). "Similarly, in *The Ambrose Light*, the Southern District of New York held that courts may not inquire into whether belligerents 'should' be recognized or not, but once belligerents are recognized by the United States or other nations, this 'authorizes courts of law to treat the insurgents as lawful combatants.'" *Id.* at 12-13 (quoting *Ambrose Light*, 25 F. 408, 418-19 (S.D.N.Y. 1885)). When the Executive recognizes a conflict as a civil war and the "rebels" as belligerents, the courts cannot prosecute the belligerents for acts of legitimate warfare without violating U.S. neutrality. The *Palmer* Court's "neutrality doctrine" has long been part of United States common law and is firmly rooted in separation of powers.

---

[64] *See* Doc. 429 ("Defendants have shown that the United States Executive recognized the Syrian Opposition Council and the Free Syrian Army as a belligerent entity").

[65] Wolfrum & Philipp, *supra* note 14, at 580 ("In the [Afghan conflict] there were no signs of recognition of the Taliban as a belligerent party neither from the side of the still existing government of Afghanistan nor from any other state.").

Here, the United States recognized the existence of the Syrian Civil War and remained, at least, neutral. In practice, it sided with the belligerents fighting the Assad regime. By contrast, in the Afghan conflict, in 2009, the United States did not remain neutral and did not recognize the existence of a civil war. It firmly sided with President Karzai against the Taliban *insurgency*. Although the United States did not designate the Taliban an FTO, the Executive, President Bush, had long ago announced "that the Taliban militia were unlawful combatants pursuant to GPW and general principles of international law, and, therefore, they were not entitled to POW status under the Geneva Conventions." *United States v. Lindh*, 212 F. Supp. 2d 541, 554 (E.D. Va. 2002). From the Executive's declaration in 2002 to 2009, the Taliban had become less powerful and the legitimate government of Afghanistan had become more stable.[66]

The *Hamidullin* decision must be read against the factual backdrop of the Taliban insurgency, which was not a recognized civil war. When Hamidullin attacked a U.S. aircraft in 2009, it was an act of mere brigandry. Hamidullin claimed he was entitled to combatant immunity because Afghanistan was at war with the United States, but the *Hamidullin* court responded that there was no longer a war between the United States and the Taliban "government" of Afghanistan. *Hamidullin*, 888 F.3d at 72. The *Hamidullin* court did not need to address the situation of belligerents in a recognized civil war, because there was no recognized civil war and there were no belligerents—only Taliban terrorists who were, at most, insurgents. *Id.* at 69 ("[B]y 2009, the conflict in Afghanistan had shifted from an international armed conflict between the United States and the Taliban-run Afghan government to a non-international armed conflict *against unlawful Taliban insurgents*.") (emphasis added). Under these particular circumstances, it sufficed to observe that, contrary to Hamidullin's contention, "the conflict in Afghanistan was not an

---

[66] *See generally* KATZMAN & THOMAS, *supra* note 2, at 7-9.

international armed conflict." *Id.* at 75. The court considered only the situation before it—that is, an insurgency the Executive had not recognized as a civil war.

The Court should also read the Fourth Circuit's rejection of Hamidullin's common-law argument in this context. Hamidullin argued that his actions were excused under the "public authority" doctrine. *Id.* at 75. But "the public authority defense looks to whether the defendant's actions were sanctioned by a U.S. official, as foreign officials do not have authority to authorize violations of U.S. criminal law." *Id.* Because the Taliban was merely an insurgent group attacking the legitimate government of Afghanistan, and there was no recognized civil war, the Taliban's actions were not sanctioned by the U.S. government. Hamidullin apparently did not cite all the same authority as Defendants here. For instance, the *Hamidullin* court did not address *Palmer*, *The Ambrose Light*, or *The Prize Cases*, or other cases pertaining to the neutrality doctrine, which Judge Noce relied on in his O&R. Because Hamidullin argued he was involved in an IAC with the U.S., the court did not need to address precedent regarding the U.S. position of neutrality toward recognized belligerents in a foreign civil war. This Court should adopt Judge Noce's O&R with the Defendants' requested modifications, as Judge Noce applied the correct law under the factual circumstances present in this case.[67]

The Government contends Judge Noce's well-supported O&R is "unprecedented." Doc. 439 at 4. But assuming this is true, it's only because the Government's position is unprecedented. Defendants are not aware of any other case—*Hamidullin* included—in which the Government took the position that members of a group the U.S. politically and financially supported in a recognized

---

[67] In a single clause, the Government also asserts that "[t]he Defendants did not proffer facts to support the prisoner-of-war elements either." Doc. 439 at 14 n. 5. This is factually false. Defendants proffered, and Judge Noce cited, several facts related to each of the combatant immunity factors. *E.g.* Doc. 424 ¶¶ 21-45; Doc. 429 at 20. Without knowing what the Government means—if anything—it is impossible to respond to this bald assertion.

civil war could be categorically branded "a band of insurgent outlaws to be dealt with as criminals." *United States v. Hamidullin*, 114 F. Supp. 3d 365, 387 (E.D. Va. 2015).

It's true that some dicta in *Hamidullin*, taken at face value, seem in tension with Judge Noce's O&R. As explained in the following section, however, to the extent that Judge Noce's O&R and the *Hamidullin* court's language are not reconcilable, this Court should reject the language from the *Hamidullin* decision, which is not binding, in favor of the mandatory Supreme Court precedent cited by Judge Noce.

## II.   The GPW does not preempt the United States' common law regarding combatant immunity in a civil war.

> "The better view is that statutes will not be interpreted as changing the common law unless they effect the change with clarity."[68]

The Government invites this Court to apply the language of the *Hamidullin* decision outside its narrow factual context. This Court should reject the invitation. Contrary to the Government's reading of *Hamidullin*, the GPW does not preempt Supreme Court precedent allowing some belligerents in recognized civil wars to claim combatant status. In fact, the GPW encourages a broad application of combatant immunity. This Court should not read the GPW to supplant common law providing greater protection to recognized civil war combatants when Article 3 of the GPW expressly states that its provisions apply "as a minimum."

A statute or treaty will not supersede common law unless its plain language contradicts the common law. Under Eighth Circuit precedent, "[u]nless the language of a statute directly negates the common law, the statute must be interpreted in conformity with the common law." *HOK Sport,*

---

[68] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 318 (2012).

*Inc. v. FC Des Moines, L.C.*, 495 F.3d 927, 936 (8th Cir. 2007); *see also United States v. Texas*, 507 U.S. 529, 534 (1993) ("In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law."). This rule also applies to treaties like the GPW. *Cf. United States v. Gotchnik*, 222 F.3d 506, 509 (8th Cir. 2000) (noting that treaties are treated like federal statutes); *see also European Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123, 132 (2d Cir. 2004), *vacated on other grounds by*, 544 U.S. 1012 (2005) (applying the common-law canon to a treaty).

Contrary to the Government's argument, the GPW not only does not contradict but supports United States common law applying combatant immunity in the civil war context. As Judge Noce observed, the GPW encouraged the High Contracting Parties to adopt broader protections to NIACs than those outlined in Article 3. The GPW "encourages signatory states to extend [lawful combatant immunity] protections to [NIACs]." Doc. 429 at 9 (citing GPW art. 3). In other words, the GPW sets a humanitarian floor, not a ceiling. While this Court is not bound by *Hamidullin*, it is bound by the Supreme Court precedent Judge Noce based his O&R on.

The drafting history of the Geneva Conventions makes clear the drafters' intent to allow High Contracting Parties to apply broader protections, including combatant immunity, to participants in certain NIACs. The International Committee of the Red Cross (ICRC) originally sought to apply the full conventions to NIACs in the draft submitted at Stockholm.[69] Under the Stockholm proposal,

> [i]n all cases of armed conflict which are not of an international character, especially cases of civil war, colonial conflicts, or wars of religion, which may occur in the territory of one or more of the High Contracting Parties, the implementing of the principles of the

---

[69] COMMENTARY ON THE GENEVA CONVENTIONS OF 12 AUGUST 1949: III GENEVA CONVENTION RELATIVE TO THE TREATMENT OF PRISONERS OF WAR 31 (Jean S. Pictet ed., 1960), https://bit.ly/2LXFNrG.

> present Convention shall be obligatory on each of the adversaries.
> The application of the Convention in these circumstances shall in no
> wise depend on the legal status of the Parties to the conflict and shall
> have no effect on that status.[70]

This proposition was controversial, and both sides of the controversy understood that the proposal would extend combatant immunity protections to the parties in a civil war.

Some delegations opposed "the unqualified application of the Convention to such conflicts."[71] These delegations recognized that "the de jure Government" would "be compelled to release captured rebels as soon as order was re-established, since the application of the Convention would place them on the same footing as prisoners of war."[72] They worried that such a broad application of the conventions would interfere with state sovereignty and impede their ability to put down a rebellion.

On the other hand, other delegations "regarded the proposed text as an act of courage."[73] These delegations observed that "[i]nsurgents . . . are not all brigands. It sometimes happens in a civil war that those who are regarded as rebels are in actual fact patriots struggling for the independence and the dignity of their country."[74]  Moreover, "the behaviour of the insurgents in the field would show whether they were in fact mere felons, or, on the contrary, real combatants who deserved to receive protection under the Conventions."[75] Thus, it "was not possible to talk of

---

[70] *Id.*

[71] *Id.* at 32.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.* [sic]. "Behaviour" is the British spelling.

'terrorism', 'anarchy' or 'disorder' in the case of rebels who complied with humanitarian principles," even in the context of a civil war.[76]

In light of these conflicting views, "[i]t seemed difficult to reach a majority in favour of any one solution."[77] Finally, the drafters proposed a compromise, which became the final version. Under this compromise, "[i]n the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, *as a minimum*," basic humanitarian provisions.[78] The compromise limits the provisions of the Conventions that signatory states are *required* to follow in a NIAC but allows signatory states to apply broader protections.

The drafters of the GPW saw the "as a minimum" language included in the final draft as essential. "Care has been taken to state, in Article 3, that the applicable provisions represent a compulsory minimum. The words 'as a minimum' must be understood in that sense."[79] At the same time, the words "are an invitation to exceed that minimum."[80] Further, "[t]he time may come when, in accordance with the law of nations, the adversary may be *bound* by humanitarian obligations which go farther than the minimum requirement stated in Article 3."[81] For instance, although "Article 3 does not protect an insurgent who falls into the hands of the opposing side from prosecution in accordance with the law,. . . once the fighting reaches a certain magnitude and the

---

[76] *Id.* at 32-33.

[77] *Id.* at 33 [sic]. "Favour" is the British spelling.

[78] *Id.* at 27 (emphasis added).

[79] *Id.* at 38.

[80] *Id.*

[81] *Id.* (emphasis added).

insurgent armed forces meet the criteria specified in Article 4. A.(2),[82] the *spirit* of Article 3 certainly requires that members of the insurgent forces should not be treated as common criminals."[83] In other words, when a civil war reaches a certain magnitude and the rebels in a recognized civil war achieve international recognition as belligerents, the rebels can obtain combatant immunity if they satisfy the four combatant immunity factors.

To be clear, Defendants are not contending that this Court should disregard the plain language of the GPW in favor of its drafting history or "spirit." On the contrary, Defendants contend that this Court should take Article 3 at its word that it represents a "minimum." While the Court is not bound by the spirit of Article 3 as expressed by its drafters, the common law of the United States goes beyond the GPW's minimum and extends lawful combatant status to certain civil-war belligerents. This common law implements as binding authority what the drafters of the GPW call the "spirit" of Article 3. Scholars of the GPW have recognized that, consistent with the "as a minimum" language, combatants in wars of liberation can still find protection "as recognised belligerents."[84] "If a foreign state recognises the state of belligerency it brings about the operation of the laws of war just in relation between the rebels and the recognising government."[85]

The Government, by contrast, argues that this Court should disregard the GPW's plain language, as well as its drafting history, and hold that the GPW excuses the Court from following mandatory U.S. authority applying combatant immunity in the civil war context. The Government makes this argument even though the drafters of the GPW are pellucid that U.S. common law

---

[82] The "criteria specified in Article 4" are identical to the *Lindh* factors recited in the O&R.

[83] COMMENTARY, *supra* note 69, at 40 (emphasis added).

[84] Wolfrum & Philipp, *supra* note 14, at 579 [sic]. "Recognise" is the British spelling.

[85] *Id.*

represents the "spirit" of Article 3. According to the Government, "[i]f this clause meant what the Defendants argue it does, then the GPW would be inviting States to immunize lawless insurgent groups." Doc. 439 at 19. This is simply not the case. By definition, the combatant immunity doctrine would "immunize" only belligerents who generally follow the law of war and only for their acts of legitimate warfare. Besides, under the Government's flawed reasoning, "immuniz[ing] lawless insurgent groups" is exactly what the United States did when it authorized the SSG to support the FSA. The United States violated international law under the Government's *ad hoc* position but not under the plain language of the GPW.

The Government also cites *Hamidullin* to argue that Defendants' interpretation of the GPW would allow terrorist organizations to claim combatant immunity. The Government melodramatically declares that "applying combatant immunity beyond the GPW framework would inhibit the Government's ability to bring terrorists and other brutal insurgents to justice." Doc. 439 at 5. But this is absurd for at least three reasons. First, as Judge Noce recognized in his O&R, it is legally impossible for designated FTOs to obtain combatant immunity because, by definition, they do not generally comply with the laws of war. Doc. 429 at 20. The O&R defers to the Executive's judgment on whether there is legitimate warfare and a civil war, but it also defers to the Executive's judgment on whether an organization is an FTO.

Second, the Government can always prosecute those who fight for[86] or support designated FTOs under 18 U.S.C. § 2339B. As the Supreme Court has held, § 2339B applies whether the defendant supports "lawful" conduct or not. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010). Section 2339B prohibits even constitutionally protected conduct as long as the conduct is "under the direction and control" of a designated FTO. *Id.* at 23-24. So, under § 2339B, even if an

---

[86] Providing oneself as "personnel" is a form of support under § 2339B.

22

FTO could claim combatant immunity, the Government could still prosecute someone who supported the FTO. The Government has avoided charging § 2339B in this case, because it knows that it will have a difficult time proving beyond a reasonable doubt that Abdullah Ramo Pazara fought for a designated FTO—or that Defendants believed he did—during the period of the indictment.

Finally, as the delegations that supported the original draft of Common Article 3 recognized, individuals entitled to combatant immunity, by definition, generally follow the law of war. So, in a basic sense, it is "not possible to talk" of terrorism in the context of combatant immunity. The Government points out that the Taliban and the Haqqani Network, the groups at issue in *Hamidullin*, were not designated FTOs at the time of Hamidullin's alleged crimes. But the United States generally recognized that the Taliban met the criteria of a terrorist group,[87] and the Executive declared separately that Taliban fighters were unlawful combatants.[88] Indeed, the district court in *Hamidullin* held that the Taliban did not satisfy the combatant immunity factors. *Hamidullin*, 114 F. Supp. 3d at 387. A group could obtain combatant immunity only if the factfinder decided that the group generally followed the law of war. Without proffering any evidence, the Government assures the Court that it will prove at trial that the "groups" Defendants allegedly supported included multiple FTOs and that these groups committed war crimes. Doc. 429 at 13-14. If the Government can prove Defendants knew this, though, it's hard to see what the Government is so concerned about. By proving beyond a reasonable doubt that Defendants intended to support war crimes (or that Defendants otherwise intended to support murder rather than lawful combat against the Assad regime), the Government can prevail.

---

[87] Farivar, *supra* note 31.

[88] *Lindh*, 212 F. Supp. 2d at 554.

To be blunt, the Government wants this Court to declare every non-Assad fighter in Syria a murderer—including the fighters the Government supported and permitted a United States non-profit to support—so that it does not have to prove any facts other than that Defendants knew Pazara was fighting in Syria. This position is shortsighted and not mandated by the GPW.

In a misguided attempt at legal jiu-jitsu, the Government maintains that the license OFAC granted to the SSG actually *supports* its position. According to the Government, "the existence of such a license would strongly highlight that Pazara himself did not have the permission of an OFAC license, much less permission to engage in lethal violence." Doc. 439 at 24-25. But the Government misunderstands the purpose of the OFAC license. OFAC did not and could not excuse supporting murder in violation of 18 U.S.C. §§ 2339A and 956(a).  Rather, OFAC granted the license to the SSG to exempt FSA leaders from Executive Order 13582, which forbade support of Assad. President Obama issued EO 13582 "in order to take additional steps with respect to the *Government of Syria's* continuing escalation of violence against the people of Syria."[89] Although they were now part of the rebellion, the leadership of the FSA arose from the ranks of the Syrian army. Supporting those officials would arguably have violated EO 13582. The OFAC license simply had nothing to do with § 2339A, as the Government implies. To put it mildly, the Government has not accused the Defendants in this case of unlawfully supporting Bashar al-Assad or the Syrian government.

OFAC apparently regarded it as common sense that supporting the FSA in its struggle against the Assad regime was not supporting murder.[90] Historically, it has never occurred to the

---

[89] Exec. Order No. 13,582, 76 Fed. Reg. 162 (Aug. 17, 2011), https://bit.ly/2xFKUK6 (emphasis added).

[90] In interviews and presumably in its application letter to OFAC, the Syrian Support Group was open about its goal "to arm the rebels trying to overthrow Syria's government." Steven Lee Myers,

Government to regard freedom fighters as murderers when their goals align with the U.S.'s foreign policy interests. For instance, in 1961, Attorney General Robert F. Kennedy wrote a letter addressing "a number of inquiries from the press about our present neutrality laws and the possibility of their application in connection with the struggle for freedom in Cuba."[91] He explained that "[t]here is *nothing criminal* in an individual leaving the United States with the intent of joining an insurgent group. . . . No activities engaged in by Cuban patriots which have been brought to our attention appear to be violations of our neutrality laws."[92]

Because the GPW sets only the minimum requirements, and United States common law accords lawful combatant status to belligerents in certain NIACs, this Court should reject the Government's objections.

### III.   The GPW does not preempt the *Palmer* neutrality doctrine.

Regardless of whether the GPW preempts the combatant immunity doctrine in civil wars or the "public authority" doctrine cited by Hamidullin, it does not preempt the *Palmer* neutrality doctrine in which Judge Noce rooted his O&R. The GPW addresses the rights and responsibilities of the *parties* to a conflict under international law. Although the United States funded and supported the Syrian rebels, it was not a party to the Syrian Civil War during the period of the indictment. Thus, its responsibilities as a third party toward the Syrian Civil War combatants are governed by its own common law, not by the GPW.

---

*Syrian Émgrés Seek Aid in U.S. to Arm Rebels,* N.Y. TIMES (Aug. 29, 2012), https://nyti.ms/2kQirbr.

[91] Statement by Att'y Gen. Robert F. Kennedy, Dep't of Justice (April 20, 1961), https://bit.ly/2kVpI9I.

[92] *Id.* (emphasis added).

Under the *Palmer* neutrality doctrine, "the Court is not being asked to make a diplomatic decision regarding the Syrian conflict. Instead, [the] Court is asked to infer what the diplomatic position of the United States was, during the relevant period, with regard to the Syrian conflict, from the Executive's statements and actions." Doc. 429 at 12. "[I]f the government remains neutral, and recognizes the existence of a civil war, its courts cannot consider as criminal those acts of hostility which war authorizes." *Id.* (quoting *Palmer*, 16 U.S. at 634). This doctrine rests on sound separation-of-powers principles. "To decide otherwise, would be to determine that the war prosecuted by one of the parties was unlawful, and would be to arrange the nation to which the court belongs against that party. This would transcend the limits prescribed to the judicial department." *Id.* (quoting *Palmer*, 16 U.S. at 634). In other words, as applied here, by allowing prosecution of "those acts of hostility which war authorizes," the Court would be dictating foreign policy, effectively forcing the Executive take a side in the Syrian Civil War.

Contrary to the Government's suggestion, the GPW does not preempt the *Palmer* neutrality doctrine, which is longstanding law in the United States. According to the *Hamidullin* court, "[j]ust as a statute preempts common law when Congress speaks directly to the question, a self-executing treaty like the Third Geneva Convention would similarly preempt common law *if the treaty speaks directly to the question*." 888 F.3d at 76 (emphasis added). But the GPW does not speak, even indirectly, to a third-party's responsibility toward belligerents in a civil war recognized by the third-party's Executive. Article 3 begins, "In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, *each Party to the conflict* shall be bound to apply, as a minimum, the following provisions . . . ." So, even if, contrary to the "as a minimum" language, the GPW supersedes the ability of a party to a conflict to recognize a

belligerent as a lawful combatant, it does not affect the *Palmer* neutrality doctrine at all.[93] Under this doctrine, the United States cannot try Defendants for supporting Pazara's legitimate acts of warfare as a belligerent in a recognized civil war. Accordingly, this Court should reject the Government's objections and adopt Judge Noce's R&R in full, except insofar as Defendants objected.

## Conclusion

As Judge Noce explained in his O&R, the United States Executive recognized the Syrian rebels as belligerents in a foreign civil war. Unlike the Afghan Taliban, the Syrian rebels were supported financially and politically by the United States. And the Executive recognized the Syrian Civil War as a civil war, in contrast to the Taliban insurgency, which the president did not recognize as a civil war. Under these circumstances, different from the circumstances in *Hamidullin*, recognized belligerents in the Syrian Civil War are eligible for combatant immunity, and the courts must not interfere with the United States' neutrality.

---

[93] The Neutrality Act, still good law in the United States, is based on the same principles as the *Palmer* neutrality doctrine and complements it. Under the Neutrality Act,

> Whoever, within the United States, knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 960. The Neutrality Act complements the *Palmer* neutrality doctrine because, just as the *Palmer* neutrality doctrine prevents *courts* from dictating foreign policy in a recognized civil war, so the Neutrality Act prevents *private individuals* from dictating foreign policy. That said, the United States has historically been criticized when it has tried to apply the Neutrality Act to people fighting in alignment with U.S. interests. *See, e.g.*, Staff, *Charges Dropped in Laotian Coup Plot*, Mercury News (Jan. 10, 2011), https://bayareane.ws/2xS46EH.

The GPW, by its express language, does not forbid signatories from applying the combatant immunity defense in civil wars. In fact, it encourages signatories to apply broader protections in NIACs. Moreover, Article 3 of the GPW governs only the Parties to a NIAC. Therefore, it does not address, directly or indirectly, the position of third-parties toward belligerents in a recognized civil war.   Under *Palmer*, when the Executive has recognized a civil war and remains neutral, United States courts cannot try individuals for those acts of hostility which war authorizes. Accordingly, this Court should reject the Government's objections and adopt Judge Noce's O&R with only the emendations requested by Defendants.

Dated: June 21, 2018

Respectfully submitted,

*/s/ Charles D. Swift*
Charles D. Swift
Pro Hac Attorney for Defendant Armin Harcevic
TX State Bar No. 24091964
Constitutional Law Center for Muslims in America
833 E Arapaho Rd, Suite 102
Richardson, TX  75081
(972) 914-2507
cswift@clcma.org

*/s/ Catherine McDonald*
Catherine McDonald
Pro Hac Attorney for Defendant Armin Harcevic
TX State Bar No. 24091782
Constitutional Law Center for Muslims in America
833 E Arapaho Rd, Suite 102
Richardson, TX  75081
(972) 914-2507
cmcdonald@clcma.org

*/s/ Diane Dragan*
Diane Dragan, Assistant Fed. Public Defender
Attorney for Defendant Ramiz Hodzic
1010 Market St., Suite 200
Saint Louis, Missouri 63101
Telephone: (314) 241-1255

Facsimile: (314) 421-3177
Diane_Dragan@fd.org

*/s/ Kevin Curran*
Kevin Curran, Assistant Fed. Public Defender
Attorney for Defendant Ramiz Hodzic
1010 Market St., Suite 200
Saint Louis, Missouri 63101
Telephone: (314) 241-1255
Facsimile: (314) 421-3177
Kevin_Curran@fd.org

*/s/ JoAnn Trog*
JoAnn Trog                42725MO
Attorney for Defendant Rosic
121 West Adams Ave.
Saint Louis, Missouri 63122-4022
Telephone:   314-821-1111
Facsimile:      314-821-9798
jtrogmwb@aol.com


*/s/ Kim C. Freter*
Kim C. Freter #47777MO
Attorney for Sedina Hodzic
225 S. Meramec, Ste. 1100
Clayton, MO 63105
Phone:  314-721-6565
Fax:      314-269-1042
kimfed@freterlaw.com

*/s/ Andrea E. Gambino*
Andrea E. Gambino
Law Offices of Andrea E. Gambino
Co-Counsel for Defendant Mediha Salkicevic
53 W. Jackson Blvd., Suite 1332
Chicago, Illinois  60604
(312) 322-0014 or (312) 952-3056
fax:  (312) 341-9696
agambinolaw@gmail.com

*/s/ J. Christian Goeke*
J. Christian Goeke #39462MO
Co-counsel for Defendant Mediha Salkicevic
7711 Bonhomme Avenue
Suite 850

29

Clayton, MO 63105
(314) 862-5110
(314) 862-5943- Facsimile
chris@jcgoekelaw.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of Defendant' Joint Response to Government's Objections to Magistrate Judge Noce's Report and Order was electronically filed  and served on the Court's electronic filing system:

DATED this 21st day of June, 2018.

*/s/ Charles D. Swift*
Charles D. Swift
Pro Hac Attorney for Armin Harcevic
833 – E. Arapaho Rd., Ste. 102
Richardson, TX  75081
Tel: (972) 914-2507
Fax: (972) 692-7454
cswift@clcma.org